# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    *Plaintiff,*

vs.

    Case No. 18-10018-EFM

TIMMIE JOE ROGERS,

    *Defendant.*

## MEMORANDUM AND ORDER

This matter comes before the Court on three different motions by Defendant Timmie Joe Rogers: a Motion to Dismiss Indictment (Doc. 27), Motion to Suppress Illegally Seized Evidence (Doc. 28), and Motion to Suppress Facebook Warrant (Doc. 29). For the reasons described in more detail below, the Court finds that Defendant's motions to suppress evidence are without merit and denies them. The Court also declines to dismiss the indictment against Defendant, but the Court will partially limit witness testimony.

### I.    Factual and Procedural Background

In September 2014, FBI Agent Kuhn submitted an affidavit and application for a search warrant of Defendant's Facebook account. In this affidavit, she stated that she learned from Defendant's ex-wife about sexual conversations on Facebook between Defendant and young females. Screenshots of these messages were provided to Agent Kuhn.

After reviewing those messages, the agent identified at least two minor victims and stated that Defendant knew that at least one of the females was a minor. In addition, Agent Kuhn set forth the content of the Facebook conversations in the affidavit. Agent Kuhn stated that the content suggested an on-going relationship with the minors that pre-dated the screenshots.

Agent Kuhn sought nine categories of information to be disclosed from Facebook. This included (1) all contact information; (2) all photoprints; (3) all neoprints; (4) all communications and messages made or received by Defendant, including private messages; (5) all IP logs; (6) all information about Defendant's access and use of Facebook marketplace; (7) the length of service, types of service, and source of payments associated with the service; (8) all privacy settings and other account settings; and (9) all records pertaining to communications between Facebook regarding Defendant or Defendant's user account.

She also stated what information would be seized by the government. This included such information as (1) records relating to who created, used, communicated, or controlled Defendant's account; (2) communications between Defendant and one minor (J.J.); (3) communications between Defendant and a second minor (D.W.); (4) communications between Defendant and any person or entity which demonstrates sexual interest in or sexual exploitation of minors; and (5) date or content that relates to enticing a child, production of child pornography, distribution/receipt/possession of child pornography, or which otherwise demonstrates a sexual interest in or sexual exploitation of minors.

After reviewing the affidavit and the application for warrant, the U.S. Magistrate Judge approved and issued the search warrant on September 22, 2014.

The case was reassigned from Agent Kuhn to Agent Jason Velazco in October 2017. Agent Velazco interviewed D.W., at her place of work, on October 19, 2017. In this interview,

D.W. remembered meeting Defendant several years prior. She did not recall if Defendant knew her age. D.W. also remembered having sexual conversations with Defendant and meeting him in person. D.W. stated that they did not have sex. In addition, D.W. could not recall whether she sent any nude images to Defendant but thought that it was possible that she did. She stated that some of the photographs D.W. sent were images downloaded from the internet that she stated were not really of her.

Agent Velazco scheduled an additional follow-up interview with D.W. for November 1, 2017. This interview occurred at the Salina Child Advocacy Center ("CAC"). An FBI Child/Adult Forensic Interviewer conducted this interview. Agent Velazco and an FBI Victim Specialist observed the interview from a different room. The interview was video recorded at the facility with the Salina CAC equipment.

An issue occurred with the recording equipment. Only the first five minutes and the last three minutes of the interview were recorded both visually and audibly. There is a forty-nine minute time-gap that failed to record. As will be discussed in more depth below, the missing 49 minutes of audio and video from the recording, and the failure to notice the missing minutes until May 2018, impacted this case and led to one of the motions at issue.[1]

In February 2018, the government charged Defendant Rogers with two counts of sex trafficking a minor pursuant to 18 U.S.C. § 1591(b)(2). The first count allegedly happened on March 30, 2014, and the second count allegedly happened on July 7, 2014.[2]

---

[1] Additional factual and procedural information will be discussed below in connection with Defendant's Motion to Dismiss Indictment.

[2] The government filed a Superseding Indictment on October 10, 2018. The Superseding Indictment still charged Defendant with sex trafficking pursuant to 18 U.S.C. § 1591, but the government changed the underlying words from "solicitation" to "recruitment" to match the words of the statute in effect at the time of the offense.

Defendant has filed three motions: a Motion to Dismiss Indictment (Doc. 27), Motion to Suppress Illegally Seized Evidence (Doc. 28), and a Motion to Suppress Facebook Warrant (Doc. 29). The Court held a hearing on these motions on November 26, 2018. The Court will address each motion in turn.

## II. Analysis

### A. Motion to Dismiss Indictment (Doc. 27)

Defendant requests that the Court dismiss the indictment against him because he asserts that the government violated his due process rights and its own discovery obligations. He contends that he has a due process claim under the standards set forth in *California v. Trombetta*[3] and *Arizona v. Youngblood*.[4] Defendant asserts that the appropriate remedy is dismissal of the charges against him. In the alternative, Defendant requests that the Court exclude the witness from testifying or limit the witness' testimony.

*1. Additional Factual and Procedural Background*

As noted above, an interview with D.W. occurred on November 1, 2017, at the CAC. Agent Velazco did not conduct the interview, but he was present and observed the interview from another room. The interview was also recorded.

In February 2018, during discovery of this case, the government provided a written report by Agent Velazco summarizing his initial October 19, 2017, interview and the in-depth interview on November 1, 2017. In addition, the government provided a video recording of the November 1 interview.

---

[3] 467 U.S. 479 (1984).

[4] 488 U.S. 51 (1988). Defendant also contends that there is a *Brady* violation and a Rule 16 violation. The Court finds that Defendant's arguments are not well developed and will not address these contentions in this Order.

-4-

When Defendant's counsel played the video, it was not complete. It played approximately the first five minutes and then the video and audio cut out, and a blank screen showed for about 49 minutes. The recording restarted and contained approximately three minutes of recorded material. During the recorded times, Defendant is not mentioned.

On March 30, 2018, Defendant's counsel contacted the government and stated that the video was not playing and that the media data folders were empty. Several days later, the government provided Defendant a new copy of the interview and indicated that the video had been checked and it played. The government did not watch the entirety of the video but instead only checked the beginning of the video to see if it played.[5] Several weeks later, on April 27, 2018, Defendant contacted the government again and stated that this video was also defective. In this email, Defendant indicated that the video skipped from about 9:39 to 10:39.

The government then contacted the agent to determine if his video copy skipped. In this email, the government first incorrectly told the agent that the video skipped for approximately one minute. The government also sent a second email to the agent that day indicating that the video skipped from 9:39 to 10:39.

On the same day, the agent responded by email to government's counsel and stated that he had reviewed his copy and there did not appear to be an issue with skipping. During the hearing, the agent stated that he played the video, but he did not pay close attention to it. He did not look at the specific time that he was informed that the video skipped, and he was multi-tasking while

---

[5] The government contends that it did not know the exact issue (skipping in the middle of the video) and believed that the video did not play at all.

watching it, so he did not notice the missing 49 minutes. The agent made a copy of the video and provided it to the government on a flash drive who then provided it to defense counsel.

The government stated in its April 30 email to defense counsel that the agent checked the original and that it did not skip. Later that day, the government emailed defense counsel (and carbon copied the agent on the email) stating that the government was going to pick up the flash drive with the copied interview. The government also stated in this email that the agent had verified that the whole interview was on the flash drive. Furthermore, the government stated that the agent was willing to watch the video with defense counsel should there be any additional problems.

On May 14, 2018, several weeks after being provided the video, defense counsel contacted the government for a third time stating that 49 minutes of audio and video was missing in the middle of the recording. On this date, the government noticed that the "skip gaps during playback" function had been activated. Once Agent Velazaco was made aware of this function, he reviewed his disk and found that his copy also did not contain the 49 minutes of audio and video and only contained eight minutes of the approximate hour-long interview.

On May 17, 2018, Agent Velazco contacted the government and defense noting that his video had the same time gap on it. He also stated that he had contacted the CAC but did not believe that there would be a complete copy of the video available. After Agent Velazco verified that the CAC did not retain any additional data, Agent Velazco prepared an additional report based on his recollection of the November 1, 2017, interview.

On June 14, 2018, defense counsel contacted the government to request a third continuance. The government objected to this request. Defendant requested a continuance but did not state that there were any discovery problems.

On July 13, 2018, the Court held a hearing on Defendant's request for continuance. During this hearing, the parties brought up the issue with the video. The Court granted the parties additional time to address the issue.

Defendant then filed a Motion to Dismiss Indictment. In this motion, he argues that the government violated Defendant's due process rights and its own discovery obligations. The Court held a hearing on this motion, as well as Defendant's two motions to suppress, on November 26, 2018.

Subsequent to this hearing, and pursuant to the Court's suggestion during the November 26 hearing that comparable evidence seemed to exist if the witness was re-interviewed by the government, the government scheduled an additional interview with D.W., the victim/witness in the case. The government gave defense counsel the opportunity to participate in the interview, but defense counsel declined. On December 4, 2018, D.W. was interviewed at the CAC by the same forensic interviewer who previously interviewed her. Two additional agents observed the interview,[6] and the video was recorded. The interview was approximately 47 minutes with a nine-minute break. The government then delivered a copy of this video to defense counsel for their review.

Defendant filed a supplement to his Motion to Dismiss. In this supplement, he addresses D.W.'s testimony in her re-interview. He contends that the Court should still dismiss the indictment against him. In the alternative, Defendant requests that the Court exclude or limit D.W.'s testimony.

    2.    *Analysis*

---

[6] Agent Velazco was not one of those agents.

To establish a due process violation under *Trombetta*, the defendant must show (1) that the evidence possessed exculpatory significance that was apparent prior to the evidence's destruction and (2) that the evidence was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."[7] If the evidence at issue is indeterminate, the defendant must further demonstrate that the government acted in bad faith when it destroyed the evidence.[8]

The Court is doubtful that Defendant can meet the first element of a *Trombetta* claim. Specifically, the Court questions whether the agent knew of the apparent exculpatory value of the testimony in the missing video *prior to its loss*. As noted above, however, there were numerous issues by the government in discovering the missing 49 minutes. Astonishingly, the agent and the government did not review the video in its entirety prior to charging Defendant or prior to providing it to Defendant during discovery. They simply checked to see if the video played but did not watch it all. During discovery, when Defendant contacted the government stating that the video did not play, the government checked the beginning of the video to verify that it played but did not watch the entirety of the video.

One month later, Defendant again contacted the government explaining that the video skipped and gave the timeframe at which the video skipped and did not play. At this juncture, the government did not review its video but instead contacted the agent who did play the video but did not pay close attention to it. He did not look at the specific time that he was informed that the video skipped, and he stated that he was multi-tasking while watching it so he did not notice the

---

[7] *United States v. Gomez*, 191 F.3d 1214, 1218 (10th Cir. 1999) (quoting *Trombetta*, 467 U.S. at 488).

[8] *United States v. Ludwig*, 641 F.3d 1243, 1253-54 (10th Cir. 2011) (citations omitted).

missing 49 minutes. It is true that a "skip gap function" was turned on that would minimize skips in the video, but the agent observed the initial interview and knew that the interview was approximately one-hour long. The actual recorded video is only eight minutes long because it is missing 49 minutes. The difference between eight minutes and 57 minutes is significant. Furthermore, the conversation that occurred at the five-minute mark of the video is entirely different from the conversation at the 55-minute mark. After the agent "reviewed" the video, he astonishingly informed the government that his copy did not skip and provided another copy for Defendant.

Defendant contacted the government for a third time regarding the missing minutes. Only after the third contact by Defendant's counsel, and after the government finally looked into the issue in more detail and notified the agent that the skip gap function was on, did the agent discover that the video only contained eight minutes of an approximate hour-long interview. During the hearing, the Court noted that the government's and agent's conduct was reckless, inattentive, and cavalier. Although the government's conduct is inexcusably inattentive from the inception of the case until discovery of the missing minutes, the Court notes that the loss of the video appears to have happened at the time the video was recorded. Thus, the exculpatory nature may not have been apparent to the agent prior to its loss.[9] In an abundance of caution, however, the Court is willing to assume the video may have contained exculpatory evidence.

Nonetheless, the Court noted during the hearing on Defendant's motion that Defendant would likely be able to obtain comparable evidence through reasonably available means. Indeed,

---

[9] The Court previously noted during the hearing that the government did not act in bad faith. Because Defendant cannot demonstrate the element of bad faith, Defendant cannot establish a *Youngblood* violation.

after the hearing, and at the Court's suggestion, the government re-interviewed the witness. Thus, comparable evidence was reasonably available.

Defendant appears to complain that the re-interview is not comparable because it is not identical to the previous interview. There are several problems with Defendant's contention. First, Defendant's argument is speculative. Second, the evidence only needs to be comparable—not identical. Finally, Defendant's counsel was invited to participate in the interview and declined. Accordingly, the Court finds that the interview is sufficiently comparable.

Defendant, however, points out several inconsistencies between the prior and current interview.[10] To the extent that the testimony differs from what was previously known, and is prejudicial to Defendant, the Court will exclude it. Defendant asks to exclude five different pieces of evidence, and the Court will address each in turn.

Defendant first seeks to exclude D.W's testimony as to where she met Defendant. The Court will not exclude this testimony as this evidence appears irrelevant. Defendant next seeks to exclude evidence that Defendant sent nude photographs of himself to D.W. The Court will exclude this testimony with a caveat. If the government has additional extrinsic evidence demonstrating that Defendant sent D.W. photographs, the testimony will not be excluded.

Third, Defendant seeks to exclude the image of a vagina sent from D.W. to Defendant on Facebook. The Court will not exclude this evidence because it (the image) comes from Facebook records and not from D.W.'s testimony. The Court will exclude D.W's testimony relating to

---

[10] Defendant is aware of these inconsistencies because of the agent's notes regarding the November 1 interview.

whether or not the image is hers because D.W has given conflicting testimony on the issue.[11] Finally, the Court will also exclude D.W.'s testimony that she sent nude images to Defendant because of the conflicting testimony about whether or not she sent images of herself or of images that she obtained from the internet. In addition, there does not appear to be any previous testimony that D.W. sent *multiple* images. Accordingly, the Court denies Defendant's Motion to Dismiss, but it will limit some of the evidence that can be introduced against Defendant.

**B.     Motion to Suppress Illegally Seized Evidence (Doc. 28)**

Defendant argues that the U.S. Magistrate Judge for the District of Kansas lacked authority under Federal Rule of Criminal Procedure 41(b) to issue a search warrant to be executed in California. Thus, Defendant contends that the search warrant was invalid and all information obtained from the search warrant should be suppressed. The government contends that the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.*, explicitly authorizes U.S. Magistrate Judges to issue search warrants like the one at issue here. The government points out that this Court already ruled on this issue in *United States v. Shultz*.[12]

The plain language of Rule 41 and § 2703, as well as caselaw analyzing the interplay between these rules, clearly establishes that the Magistrate Judge had authority to issue the warrant in question. Rule 41(a) explicitly states "[t]his rule does not modify any statute regulating search or seizure, or the issuance and execution of a search warrant in special circumstances." The SCA authorizes a court of competent jurisdiction to issue a warrant for information identified in § 2703, and defines "a court of competent jurisdiction" as "*any* district court of the United States (including

---

[11] D.W. has stated that the image came from the internet (and was not her) and she also stated that the image was her.

[12] 2018 WL 534333 (D. Kan. 2018).

a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated."[13] Courts have recognized that this means "when the SCA applies, a magistrate judge with jurisdiction over the offense being investigated can issue a warrant to be executed outside of that judge's ordinary jurisdiction, using the procedures of Rule 41, but not constrained by the jurisdictional limitation of Rule 41(b)."[14] Thus, if a Court has jurisdiction over the offense being investigated, it may issue a warrant to search property not located in its district under § 2703.

Several courts have grappled with whether the phrase "jurisdiction over the offense" refers to subject matter, personal, or territorial jurisdiction.[15] These courts appear in agreement that "territorial jurisdiction" is required. The Court need not decide this issue here, however, because there is no dispute that each type of jurisdiction is present. The Court clearly had subject matter jurisdiction over the federal offenses being investigated, as well as personal jurisdiction over Defendant. Likewise, the affidavit connected the location of the alleged victims, as well as Defendant's account utilized in the commission of the crimes charged, to McPherson, Kansas, establishing territorial jurisdiction. The Magistrate Judge did not exceed his authority in issuing the search warrant in question here. Accordingly, Defendant's Motion to Suppress Illegally Seized Evidence is denied.

---

[13] 18 U.S.C. §§ 2703, 2711(3)(A)(i) (emphasis added).

[14] *United States v. Barber*, 184 F. Supp. 3d 1013, 1017 (D. Kan. 2016).

[15] *See id.*; *United States v. Alahmedalabdaloklah*, 2017 WL 2839645, at *4-5 (D. Ariz. 2017); *In re Search of Yahoo, Inc.*, 2007 WL 1539971, at *3-4 (D. Ariz. 2007); *In re Search Warrant*, 2005 WL 3844032, at *4-5 (M.D. Fla. 2006).

**C.     Motion to Suppress Facebook Warrant (Doc. 29)**

Defendant seeks the suppression of any information derived from the search and seizure of his Facebook account. He contends that the warrant lacked probable cause, was overbroad in scope, and lacked particularity. The government disagrees.

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' "[16] This right is personal, and "a defendant may only claim the benefits of the exclusionary rule if his own Fourth Amendment rights have in fact been violated."[17] The burden is on Defendant to establish this standing.[18] Whether Defendant had a privacy right in his Facebook account is irrelevant because the government's actions did not violate any expectation of privacy, even if he did have one.

*1.     The warrant was supported by probable cause*

Defendant first argues that the warrant was not supported by probable cause because the information was stale and came from a less than credible source. "The Fourth Amendment provides that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' "[19] A warrant affidavit must set forth particular facts and circumstances underlying the existence of

---

[16] *United States v. Johnson*, 584 F.3d 995, 999 (10th Cir. 2009) (quoting U.S. Const. amend. IV).

[17] *Id.* (quotation marks and citation omitted).

[18] *Id.* at 998. As the United States Supreme Court made clear in a recent opinion, standing in the Fourth Amendment context is not a jurisdictional question. *Byrd v. United States*, --- U.S. ---, 138 S. Ct. 1518, 1530 (2018). Instead, "[t]he concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." *Id.* Should a court determine that another justification exists for the search, it is not required to assess whether an individual possesses a reasonable expectation of privacy in the place searched. *See id.* at 1530-31.

[19] *Cassady v. Goering*, 567 F.3d 628, 634 (10th Cir. 2009) (citing U.S. Const. amend. IV).

probable cause, thereby allowing the issuing magistrate to make an independent evaluation of the matter.[20] A magistrate's decision to issue a warrant is entitled to great deference.[21]

Defendant argues that the information that the warrant was based upon was stale because the pornographic photo was exchanged six months prior to the warrant being issued. In general, "probable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched."[22] "Whether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized."[23]

Here, the information was six months old. In at least one case from the Tenth Circuit, a warrant to search the defendant's home was executed almost two and half years after the date of the most recent email.[24] The passage of time in this case is far less. As noted by the Tenth Circuit, the "passage of time alone" does not demonstrate staleness, and "the nature of the criminal activity and the nature of the property to be seized are especially relevant factors."[25] In this case, the nature of the criminal activity indicates ongoing activity. Indeed, the Facebook messages included in the affidavit in support of the search warrant were ongoing in nature. Furthermore, the nature of the evidence is ongoing and does not become stale. Defendant's Facebook account (and messages

---

[20] *Id.* at 634-35.

[21] *United States v. Gonzales*, 399 F.3d 1225, 1228 (10th Cir. 2005) (citation omitted).

[22] *United States v. Burkhart*, 602 F.3d 1202, 1206 (10th Cir. 2010) (quotation marks and citation omitted).

[23] *Id.* (quotation marks and citation omitted).

[24] *Id.*

[25] *Id.* (noting that although the passage of time of two years and four months between the date of the most recent email and the execution of the warrant gave the court "some pause," the more relevant inquiry was the nature of the criminal activity and the property to be seized).

through his Facebook account) is an ongoing electronic account that lives on the internet. Thus, the Court concludes that the information was not stale.

Defendant also contends that the agent obtained the information from an unreliable source because Defendant's ex-wife obtained and provided the information without Defendant's knowledge. But the agent did not simply rely on Defendant's ex-wife's word about the communications between Defendant and others. Instead, the agent had the source of the information (screenshots of the conversations). Indeed, the agent even included the conversations in the affidavit. The agent's affidavit was detailed and set forth numerous facts. Thus, the reliability of Defendant's ex-wife is irrelevant. Accordingly, the magistrate judge did not err in determining that probable cause supported the affidavit.

*2. The warrant was not overbroad and was sufficiently particular*

Defendant next argues that the warrant was not particularized enough and was overbroad because it allowed the government to seize the universe of information available from Facebook. With regard to the particularity requirement, the search should be "confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."[26]

Here, the warrant sought much of Defendant's Facebook. However, the agent seeking the search warrant stated with particularity the reasons for the request for much of Defendant's Facebook account. First, the agent stated that the nature of the conversations indicate a pre-existing, as well as an on-going, relationship between Defendant and two minors. Thus, the timeframe was broad because the crime that was being investigated was continual in nature. In addition, the agent also averred that from her experience and training that individuals who use the

---

[26] *United States v. Brown*, 984 F.2d 1074, 1077 (10th Cir. 1993) (quotation marks and citation omitted).

internet to engage in sexual conversations with minors often engage multiple children with the intent of finding one minor who is receptive. Finally, the agent stated that she believed that the Facebook account itself was used to facilitate the crimes and that the evidence may be found in a variety of locations across Facebook. Thus, the agent established probable cause to link the entirety of Defendant's Facebook account to her search. Although the warrant included many items from Facebook, the Court believes that it was sufficiently particular relative to the alleged crime being investigated.

Furthermore, the Facebook search warrant utilized the two-step process outlined in Rule 41(e). The search warrant included an attachment of the information to be disclosed and an attachment of the items to be seized. The information to be seized identified communications between Defendant and the two identified minors, as well as any communications between any other minors that would relate to enticement of a child, production of child pornography, or distribution/receipt/possession of child pornography. Other courts have found that the two-step process complies with the Fourth Amendment and is a practice authorized by Rule 41.[27] Accordingly, the Court finds that the warrant was not overbroad and was sufficiently particular.

   3.   *Good Faith*

"Even if the warrant was not sufficiently particularized to comply with the Fourth Amendment, the evidence need not be excluded if the search qualified under the good faith doctrine of *United States v. Leon*."[28] A court's good faith analysis is "confined to reviewing the

---

[27] *See In the Matter of Search of Info. Associated with Email Addresses Stored at Premises Controlled by Microsoft Corp.*, 212 F. Supp. 3d 1023, 1035-36 (D. Kan. 2016); *United States v. Deppish*, 994 F. Supp. 2d 1211, 1219-20 (D. Kan. 2014).

[28] *United States v. Burgess*, 576 F.3d 1078, 1095 (10th Cir. 2009) (citing *United States v. Leon*, 468 U.S. 897 (1984)).

four corners of the sworn affidavit and any other pertinent information actually shared with the issuing judge under oath prior to the issuance of the warrant, as well as information relating to the warrant application process."[29] Here, the affidavit does not reveal any evidence of bad faith on the part of Agent Kuhn. As noted above, the warrant was supported by probable cause, was sufficiently particular, and employed the two-step process under Rule 41. There is no information indicating the lack of good faith. Accordingly, the Court denies Defendant's Motion to Suppress Facebook Warrant.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss Indictment (Doc. 27) is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Illegally Seized Evidence (Doc. 28) is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Facebook Warrant (Doc. 29) is hereby **DENIED**.

**IT IS SO ORDERED**.

Dated this 28th day of January, 2019.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[29] *United States v. Knox*, 883 F.3d 1262, 1272 (10th Cir. 2018).